# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### CHARLOTTESVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | Criminal No.  3:18-CR-00011 |
| | : | |
| v. | : | |
| | : | |
| JAMES ALEX FIELDS, JR. | : | |
| | : | |

_____

## SENTENCING MEMORANDUM OF THE UNITED STATES

**"She's a communist.   An anti-white, liberal . . . It's not up for questioning…
She's the enemy.   She is the enemy."**

- James Fields, Recorded Jail Telephone Call of December 7, 2017,
  or approximately three months after his car attack, in reference to
  the decedent's mother.


**"[Y]ou refuse to accept the only way to save o[u]r Nation.   Nothing you do is
for the greater good, you will have no positive impact on this world because
you refuse to do what is [sic]nesssary."**

- James Fields, Text Message to Relative, May 21, 2017


**"[H]e kind of hated white people that liked people of color and LGBT people
just as much as he hated the blacks and 2the Hispanics and the LGBT people."**

**"[H]e thought that there had to be an uprising . . . [that] there's going to be
more minorities than white people. So, white people need to, like, wake up and
realize that so we can exterminate, you know, the colors and the gays."**

- Testimony of B.W., High School Classmate of James Fields,
  May 9, 2018.


**"He had a serious disdain or hatred for African Americans.   He tried to link
them to being the reason for the problems with this country."**

- Testimony of E.P., High School Classmate of James Fields,
  March 8, 2018.

**"You walked through the doors [of the Dachau concentration camp] and I overheard [James Fields] say this is where the magic happened. . . . He was emotionally, he was happy in one of the saddest places I have ever been. . . . I witnessed James skipping up and down the train tracks that ran through the center of the camp. . . . Like a kid at Disney World. Like he was loving it."**

- Testimony of G.D., High School Classmate of James Fields, describing a high school trip to Dachau, a Nazi concentration camp.

**"We're not the ones who need to be careful."**

- James Fields, Text Message to Relative, August 11, 2017, as he left Ohio to drive to Charlottesville, Virginia to attend the Unite the Right rally.

**"I watched a bunch of outsiders bring hate and terror into my community."**

- M.M., Victim (Count Three), Interview of October 24, 2017.

**"It was like a parade. It had drums, chanting, flags, and love. You could feel the love from really good people. The mood of the group was unified."**

- C.C., Victim (Count Four), Interview of January 9, 2018, describing the crowd that gathered at the intersection of Fourth and Water Streets.

**"I was just staring . . . [I had] never seen so many white people standing up for black people."**

- T.W., Victim (Count 23), Interview of December 6, 2017, describing the crowd that gathered at the intersection of Fourth and Water Streets.

**"I heard these thumps . . . loud thumps . . . and then there were bodies in the air."**
- T.B., Victim (Count Five), Interview of October 31, 2017.

**"I saw the blood. That's when I gave up**."

- W.B., Victim (Count Six), Interview of February 2, 2018.

**"I had to fight the feeling of wanting to go to sleep, because I thought I would**

surely die."

- N.R., Victim (Count 12), Interview of January 26, 2018.

**"I knew that it was an act of terror."**

- R.S., Victim (uncharged), Interview of November 1, 2017.

**"I thought bombs were going off but it was actually people getting hit by the car."**

- C.M., Victim (Count 16), Interview of January 30, 2018.

**"If those other cars hadn't been there . . . he would have killed so many more people."**

- K.T., Victim (Count 19), Interview of December 8, 2017.

**"The sound I heard next will stay with me. Dozens of thuds in rapid succession. It was the sound of bodies hitting metal . . . we were under attack. I am forced to re-live August 12th every time I walk past Fourth Street. . . . He saw people he hated, and he decided to try to kill them."**

- S.L., Victim (Count 20), Victim Impact Statement.

**"[I] am repugnantly reminded of what the screams of maimed and terrorized people sound like."**

- C.Y., Victim (Count 21), Victim Impact Statement.

**"My 10-year-old daughter is still in therapy. She is still scared when the vehicle makes sudden stops. This will be with her forever."**

- L.S., Victim (Count 26), Interview of April 8, 2018 (describing the emotional impact on her daughter, A.J. (Count 28)).

# I.    INTRODUCTION

The crowd had gathered in Charlottesville to protest racial and other forms of discrimination.  Some were from the local community, others had traveled throughout the night to be there.  After a day filled with conflict, fear, and violence, they eventually let their guard down.  They joined with other like-minded but different-looking individuals to celebrate their belief that the white supremacists – who had descended upon Charlottesville for their hate-filled rally – were finally disbanding.   It should have been the highlight of an otherwise horrible day.

Suddenly, that all ended.   While the group was peacefully celebrating, James Fields had been sitting in his Dodge Challenger and watching the jubilant crowd from the top of the hill.   He saw people that he hated – people he viewed as his enemy – and he decided to kill them.   He accelerated his vehicle and drove directly into the crowd of peaceful protestors, murdering Heather Heyer and injuring at least 30 innocent men, women, and children.   The victims suffered immeasurably that day, and their suffering has continued in the weeks and years to follow.

This is far from the ordinary case.   The defendant's crimes were so horrendous – and the maiming of innocents so severe – that they outweigh any factors the defendant may argue form a basis for leniency.   This is particularly true in light of the fact that he has demonstrated that he feels no remorse for his actions and continues to espouse his hateful ideology.   To hold the defendant accountable for his deliberate, callous, and wanton conduct, and to deter others from perpetrating similar acts of domestic terrorism, the Court should impose a life sentence.

## II.    SUMMARY OF THE FACTS[1]

### A. <u>Background</u>

Individuals associated with groups popularly referred to as the "alt-right" planned a "Unite the Right" rally for August 12, 2017, in Charlottesville, Virginia, for the proclaimed purpose of protesting the removal of a statue of Robert E. Lee from then-named "Emancipation Park," a downtown city park in Charlottesville.   The evening before the rally, several hundred alt-right protestors held an unsanctioned torch-lit march on the University of Virginia's campus.   As they marched through the historic center of campus, the protestors yelled anti-Semitic and white supremacist slogans, including, "You will not replace us!" "Jews will not replace us!" and "Blood and Soil!" (a German nationalist expression of racial unity popularized and adopted by the Nazis). The march ultimately culminated at the University's Rotunda, where members of the group attacked a small group of counter-protestors who were peacefully surrounding a statue of Thomas Jefferson.

Also on the evening of Friday, August 11, 2017, the defendant drove alone, overnight, in his Dodge Challenger from his home in Maumee, Ohio to Charlottesville to participate in the August 12 rally.   Before he left, the defendant discussed his plans with his mother, and copies of these rally-related text messages were found on both his and his mother's phones.   These messages offer a window into the defendant's state of mind as he prepared for and attended the

---

[1]    The following summary is based on the evidence uncovered in an extensive federal grand jury investigation into the attack, Fields's background, and his motivations.   This evidence includes more than 100 witnesses interviews (including the surviving victims, eyewitnesses who observed Fields prior to and during the attack, and Fields's family and former friends who have firsthand knowledge of his beliefs and prior conduct); grand jury testimony; information gleaned from Fields's known social media accounts, computers, and other electronic devices; photos and videos relating to the attack, including surveillance footage from Charlottesville businesses, photos and videos collected directly from bystanders and victims, and photos and videos submitted to the FBI directly through an automated system established after the attack; the victims' medical records; and forensic evidence from the crime scene and from Fields's car.

At sentencing, the government anticipates that it will provide the Court with a brief evidentiary presentation, which will include some of the most relevant video and photographs obtained in the investigation.

rally.   Several of these messages were explicitly racist in nature.   Before he left, he texted his mother a movie-derived meme that depicted Charlottesville's African-American vice-mayor as an insect-based alien life form reacting fearfully to white nationalist Richard Spencer.   After his mother urged him to be careful he responded by texting: "We're not the ones who need to be careful."   He attached an image of Adolph Hitler to that message.   Once he arrived in Charlottesville, he forwarded his mother media photos of the August 11 torch-lit march at the University of Virginia (UVA).   Later that morning, mere hours before the attack, he also sent her candid cell phone photos he took of young men on the streets of Charlottesville wearing traditional Jewish head coverings.

The defendant did not arrive in Charlottesville until the early morning of August 12 and, thus, did not attend the prior evening's torch-lit march.   After sleeping in his car for several hours in a restaurant parking lot, the defendant went to Emancipation Park dressed in the rally's unofficial uniform of khaki slacks and a white shirt.   Videos and photos taken in and around the park that morning show that the defendant arrived at the park more than three hours before the rally's scheduled noon start and quickly met and mingled with other, similarly garbed young white supremacists.   As the morning went on and altercations began to break out between rally supporters and counter-protestors around the park, the defendant obtained a shield bearing the logo of the white supremacist group Vanguard America and joined a "shield wall" of similarly armed young men around the perimeter of the park.   Video and witness accounts of the defendant and this group show the defendant yelling racist, homophobic, and anti-Jewish slurs at counter-protestors, raising his middle finger to someone videotaping the shield wall, and otherwise "enjoying himself," as one of his fellow rally supporters later observed.   According to video taken during the rally and grand jury testimony from a rally participant who met the defendant during the rally, these chants and slurs included: "Blood and Soil!" "Fuck You Faggots!" and "Jews will not replace us!"   The defendant remained in the park until law enforcement declared the gathering

an unlawful assembly.

As noon approached and the crowd grew, rally supporters clashed—often violently—with counter-protestors in Emancipation Park and on the surrounding streets. Shortly after 11:00 a.m., local officials declared a state of emergency, and at 11:31 a.m., the Charlottesville Police Department (CPD) declared the event an unlawful assembly. With the assistance of other state and local law enforcement agencies, CPD then dispersed the crowds of rally supporters and counter-protestors from the park and the immediate area around it. At that point, many of the rally supporters walked to McIntire Park, a city park on the outskirts of the downtown area. Law enforcement also dispersed that crowd, however, and many members of this group walked back downtown, where smaller groups of rally supporters and counter-protestors continued to linger and engage in spontaneous marches and celebrations for several hours after the original rally was aborted.

Immediately after CPD dispersed the crowds at Emancipation Park, the defendant walked to McIntire Park with fellow protestors. There, he met three rally supporters—Sarah Bolstad, Hayden Calhoun, and Joshua Matthews—who, like the defendant, had parked their cars in downtown Charlottesville. When it became apparent nothing was going to happen at McIntire Park, the group agreed to walk back downtown together. The defendant, Bolstad, Calhoun, and Matthews discussed the events of the day as they walked. All had been in or near Emancipation Park until the unlawful assembly declaration was issued, and none had suffered any injuries during the day. During the walk, the group discussed their respective political ideologies. The defendant told the group that he was a National Socialist (i.e., a supporter of Nazism) and that he had read Hitler's autobiography, *Mein Kampf*. Bolstad, Calhoun, and Matthews all told federal investigators that they saw no indication that the defendant had been in any physical altercations that day. They similarly agreed that the defendant did not seem particularly anxious or fearful for his safety.

Meanwhile, after the unlawful assembly had been declared, many counter-protestors retreated to the haven of McGuffey and Justice (formerly "Jackson") Parks. These two parks were the two permitted locations for counter-protestors and were located on opposite sides of Emancipation Park and separated by approximately two blocks. After some time, counter-protestors at both parks received reports that white supremacists were on their way to Friendship Court, a low-income, predominately African American neighborhood. At approximately the same time, large groups of counter-protestors from each park started to make their way to Friendship Court to lend support. The counter-protestors from Justice Park arrived first. They did not see any white supremacists, so they continued on their march. As they made their way back to Water Street, the large group of counter-protestors from McGuffey Park was arriving at the same intersection of Second and Water Streets. The two large groups of counter-protestors converged into one. The mood throughout the crowd was celebratory, with many members of the crowd chanting, singing, and cheering as the group marched.

After the defendant and his group returned to downtown Charlottesville, they walked to the defendant's car. The defendant drove and dropped off Bolstad and Calhoun at a nearby parking garage, then continued on with Matthews, who was parked at a different garage. On the way to Matthews's garage, the defendant drove past members of the same crowd of counter-protestors whom he would attack less than ten minutes later. As they drove, Matthews asked the defendant if he should roll down his window and call the counter-protestors "niggers."[2] The defendant then dropped off Matthews at a parking garage on East Market Street (hereinafter Market Street) between Fifth Street and Sixth Streets NE.

---

[2] Matthews, an avowed neo-Nazi and white supremacist, contends he was joking and that, although Fields may have laughed, he cannot specifically recall how Fields responded.

### B.     **The Attack**

After the defendant dropped off Matthews and left the garage, witness accounts and GPS associated with the defendant's mobile Facebook account indicate that he turned onto Fourth Street NE (hereafter Fourth Street), three blocks north of where he eventually drove into the crowd.   The defendant was driving behind a sedan driven by two young black women.   Witness accounts indicate that the defendant hesitated one block later, when he came to the intersection of Market and Fourth Streets.   From that intersection, the defendant had an unobstructed and direct view of the next portion of Fourth Street, a narrow side-street that slopes downhill for two blocks as it crosses a raised portion of Charlottesville's Main Street that has been converted into a downtown pedestrian mall.   Below the mall, Fourth Street flattens out at an intersection with East Water Street (hereafter Water Street).   When the defendant paused at the Market and Fourth Street intersection, a group of counter-protestors had started to gather at the Fourth and Water Street intersection.   The portion of Fourth Street between the defendant and the crowd at that intersection was largely empty of foot traffic.   Other than a minivan and the sedan the defendant had been driving behind moments before, both of which had stopped at the Water Street intersection to let the crowd pass, there were no obstructions between the defendant and the crowd.

The crowd at the Water Street intersection was a visibly racially and ethnically diverse group.   Numerous media and bystander photographs and videos show that this group was marching peacefully while chanting and carrying signs with anti-bias and related messages.   For example, an unidentified young black woman at the very front of the crowd was waving a "Black Lives Matter" sign that faced the defendant's direction up until the moment she jumped out of the way of his attack, narrowly avoiding being struck by his car.   Similarly, a less fortunate woman who was hit and badly injured was wearing a sandwich-board sign that read "End Sexism, Racism, Heterosexism, Speciesism."   Other signs visible in photographs of the attack include messages such as "Diversity Lives Here," "Solidarity," and "Love."   Up to the time immediately prior to

the attack, the crowd also was chanting, "Whose streets? Our streets!"

After pausing at the Market and Fourth Streets intersection, the defendant slowly drove his car down Fourth Street, across the pedestrian mall and onto the lower portion of Fourth Street near the crowd, which was beginning to turn onto Fourth Street, until his path was blocked by the sedan and the crowd ahead of him. The defendant stopped his car behind the sedan. Then, unmolested by the counter-protestors or anyone else, and with a clear path behind him, he slowly reversed his car up Fourth Street toward Market Street and came to a stop near the top of the hill. No obstacle prevented the defendant from continuing to back out onto Market Street, turn, and drive away from Fourth Street and the crowd at the Water Street intersection. Instead of driving away, after pausing at the top of the hill, the defendant gunned his car forward through a stop sign and across the pedestrian mall, driving directly toward the crowd of counter-protestors.[3] The defendant drove so fast that, according to multiple witnesses, his car briefly became airborne as he accelerated over an elevated portion of the roadway where the pedestrian mall crosses Fourth Street. After he cleared the mall, the defendant tapped his brakes to regain control of the car. The defendant then accelerated once again and drove directly into the crowd. No witness who saw the car from behind reported seeing brake lights as the defendant plowed through the crowd; to the contrary, the defendant's revving engine and screeching tires as he approached can be heard on a bystander's video of the attack.

Many of the people in the first few layers of the crowd saw the defendant speeding toward them and jumped out of the way. Others who were further back, or who were not focused on the road, did not see the defendant coming. Without braking, the defendant drove into these people,

---

[3] Extensive evidence, including surveillance camera footage from businesses along Fourth Street, an aerial video taken by a Virginia State Police (VSP) helicopter that had been monitoring the area, photographs and cell phone videos taken by members of the crowd and bystanders, in addition to witness accounts, clearly establish Fields's movements during the attack. Tragically, the VSP pilot and the trooper who was accompanying him were killed when their helicopter crashed later that afternoon.

directly striking and killing Heather Heyer, and injuring at least 30 others.

The forward portion of the defendant's attack was cut short by the two cars that had stopped at the Water Street intersection to allow the crowd to pass. The defendant rammed directly into the rear of the sedan he had originally been following on Fourth Street, pushing that car into the rear of the minivan in front of it, and forcing the minivan into the Water Street intersection. As the defendant's car came to a halt, members of the crowd began pushing back into the street and some began attacking his car, partially smashing the rear windshield. As this was happening, the defendant quickly threw his car into reverse and sped backwards up Fourth Street, hitting additional members of the crowd along the way. At this point, the defendant's car was heavily damaged, with a smashed windshield, large dents on his hood, his front bumper hanging off, and a shoe, sunglasses, and a water bottle stuck to various spots on the car. This time, when the defendant reached the top of the rise at Fourth and Market Street, he turned onto Market Street and fled.

### C.     <u>The Defendant's Flight and Arrest</u>

Moments after the attack, as the defendant fled, he drove by a Charlottesville Sheriff's Office Deputy who was sitting in a parked squad car. The deputy immediately pursued the defendant and conducted an initial traffic stop on the defendant's car shortly thereafter. The defendant pulled over and put his hands out the driver's side window, but when the deputy left his squad car to approach the defendant, he started to drive away again. A police helicopter was overhead tracking the defendant. After driving approximately 50-100 additional feet, the officer stopped the defendant a second time. This time, the officer ordered the defendant to throw his car keys out of the driver's side window in addition to ordering him to put his hands out of the window. The defendant complied with both commands and was arrested without further incident.

### D.     <u>Evidence of Bias Motive</u>

In addition to the evidence detailing the defendant's actions on August 12, 2017, the

prosecution team collected extensive evidence of the defendant's motivation for carrying out the attack: a long-standing hatred of Jews, African-Americans, and other non-white individuals, combined with deeply held pro-Hitler, pro-Nazi, white-supremacists beliefs. The defendant also has espoused the use of violence to implement these beliefs. Much of this evidence comes from the defendant's own words and statements, captured from his computers, phone, other electronic devices, and social-media accounts. Additional evidence of the defendant's hateful beliefs comes from individuals who knew him throughout his life, including family members, peers, and teachers, and from evidence found through the search warrant executed at his apartment.

### 1. Social Media and Text Messages

The defendant's social media accounts are rife with anti-Semitic and racist comments and images, dating back from the beginning of the defendant's use of the media. For example, on Instagram on July 4, 2017, just over one month before the rally, he messaged another user, "Stupid nigger, you'll be a slave again once we complete the Kalergi plan. Praise the [New World Order]." On July 14, 2017, he posted "Hitler was right" and "The Holocaust is a lie." Several weeks earlier, on May 3, 2017, he had posted "rid the world of [J]ews."

In the months prior to the attack, the defendant's Twitter account was similarly full of images and statements expressing white supremacist messages. In the five months leading up to the attack, the defendant tweeted or direct messaged thirty images depicting Adolph Hitler, six images depicting Zyklon-B, the nerve gas the Nazis used in gas chambers to commit mass murder, and numerous images of Nazi propaganda. He also repeatedly used the hashtag "#hitlerwasright," punctuated tweets with "Sieg Heil," expressed admiration for Hitler and Nazi Germany, argued for the superiority of the "white race," and referred to African-Americans as "nigger," "gorilla," and "retard," and to Jews as "kikes." As one example, on April 7, 2017, while engaging in a race- and ethnicity-related exchange with another Twitter user, the defendant wrote, "I'll have no problem putting a bullet in the skull of everyone who thinks like you." He then expressed the

view that it was necessary to "[r]evoke citizenship of all non-aryans.   Put liberals in work camps, [] brainwash liberals to be Nationalist.   After regaining control of our Nation, lebensraum/manifest destiny."   On March 21, 2017, he tweeted the following image:



Several weeks later, on May 6, 2017, he tweeted, "We as a people need to reclaim Leadership of our Nation, and cast off the shackles of the Jew."   On June 28, 2017, the defendant wrote, "There's nothing supremacist about wanting the Nations my people built, to be inhabited by my people."

Significantly, also in the months before the attack, the defendant posted two memes on social media that advocated using a car to run over protestors in the streets.   On May 12, 2017, he sent an Instagram user the first meme (reprinted below on the left), with the caption, "when I see protestors blocking."   Four days later, on May 16, 2017, he publicly posted the second meme (reprinted below on the right):

 

Finally, the night before the attack, the defendant exchanged text messages with his mother as he prepared to drive from Ohio to Charlottesville. As noted previously, when she warned him to be careful, he responded, "we're not the ones who need to be careful." He attached a photograph of Adolf Hitler to the message.

## 2. Witness Accounts From the Defendant's High School

Extensive interviews with the defendant's peers and teachers established that he had been open about his pro-Nazi and white-supremacist views throughout high school. Many of the defendant's classmates and teachers described instances where the defendant drew swastikas on school-related papers or on his hands, glorified Hitler and Nazi actions during World War II, advocated for the genocide of Jews and other non-white individuals, and told racist and anti-Semitic jokes. Two high school classmates (one African-American and one white) recalled that the defendant frequently talked about the need for a violent revolution to deal with the problems that he believed Jews, African Americans, and other people he perceived to be non-white posed for American society. As one of the defendant's Caucasian male classmates recounted,

> His response for a solution was always violence. I would try to reason with him and say that you ought to, if you want something to change, you should vote for it. That is you know, that is your right to vote for it, but his, he would always be determined that violence was the answer to his problems. . . .Violence towards the groups as well as violence in the streets . . . he said violence was the answer[,] that we couldn't do it politically any more.

*Testimony of E.P.*, 3/8/18, at 42-43. The purpose of this violence, this classmate explained, "was to make sure that Aryans were in charge." *Id.* at 43-44. "He would . . . always make a point to make sure that the Aryan people had a voice over others, that the Aryan[s] were the top of the realm." *Id.* at 43. "[H]e would always make a reference to what Hitler did as the solution to our problems." *Id.* at 45.

In one powerful example of the defendant's substantial bias, a female African-American classmate, B.W., recounted multiple instances of racial harassment by the defendant, and described "his general attitude [towards minorities] is that we were animals." *Testimony of B.W.*, 5/9/2018

at 22.   In one instance, the defendant asked her what she was doing that evening, and then asked: "So when are you going to come over and pick my cotton?"  *Id.* at 29.   When B.W. sobbed in response, the defendant laughed.   *Id.* at 29-30.   B.W. recalled:   "I've never heard someone laugh like that."  *Id.* at 31.

In another instance with the same classmate, the defendant asked her: "What sound does a chainsaw make?" and then answered his own question: "Run, nigger, nigger, run."  *Id.* at 28. Another time, he told B.W. that the United States should have kept its military segregated because he was planning to join the army, and in the heat of battle he very well might turn his gun on his fellow soldiers if they were African American, Jewish, or Hispanic.  *Id.* at 34-35.   B.W. also heard the defendant tell a different peer, whose white mother was married to a black man, that she was a "half-breed" and her mother was a "nigger lover."  *Id.* at 20.

High school classmates and teachers also reported that, during a post-graduation school-related trip to Germany, the defendant demonstrated his deep admiration for Adolf Hitler and Nazi-era Germany.   When the group visited the Dachau concentration camp, the defendant said, "This is where the magic happened," and then skipped happily down the train tracks that transported Jewish prisoners into the camp.  *Testimony of G.D.*, 1/10/18 at 52-53.   When they visited the gas chambers at the concentration camp, the defendant stated "It's almost like you can still hear them screaming."  *Id.* at 53-54.   When he said this, the defendant appeared "elated and happy. . . . Getting enjoyment out of it."  *Id.*

Also during high school, the defendant exhibited openly racist behavior to both his peers and to staff.   On one occasion, the defendant was suspended for calling an African-American special education teacher the "n" word, and then telling a school administrator, "I don't want any nigger calling me down to this office.   I don't want to work with him.   He is not the same as you and me and you can't change my mind."   (*Interview of M.B.*, 11/13/17).

### 3. The Defendant's Apartment and Subsequent Statements

Consistent with these reports, a post-attack search of the defendant's apartment revealed a Nazi-era German battle flag hanging on his bedroom wall and the following material on his bedside table:

 

In the time since his arrest, the defendant's telephone calls from jail confirm both that he continues to hold his racist and anti-Semitic beliefs and that he lacks remorse for his crimes. In these calls, which are mostly with his mother, the defendant has asserted that there are genetic differences between different races and ethnicities that create human "subspecies," and that social scientists are covering up the differences in mental abilities caused by race and genetics. He also has spoken favorably of eugenics and using "breeding" and "a rigid societal hierarchy" to help society evolve. He has expressed excitement over the rise of nationalist political parties in Europe. On another call he asserted that all liberals are communists who hate white people and want to destroy "our" (white) society.

### E. The Victims

The federal indictment against the defendant references the one victim he killed, Heather Heyer, and 28 others that he attempted to kill during his attack at the intersection of Fourth and Water Streets. A large portion of these victims originated as counter-protestors at McGuffey or

Justice Parks. However, an equally large contingent consisted of bystanders who observed a large group of people together in celebration of diversity and equality, and were so moved by it that they stopped to observe and, in some cases, join in. No summary could capture who these victims are, what they stand for, or how this attack has affected them both physically and emotionally. Although many will address the Court through victim impact statements, the government nevertheless finds that it is crucial to provide the Court with some background about these men, women, and children, and how they were severely impacted by the defendant's racially motivated attack.

### 1. Heather Heyer, M.B., M.M., and C.C. (Counts 1 through 4).

On the morning of August 12, 2017, Heather Heyer and her friends M.B., M.M., and C.C. met up in downtown Charlottesville around 11:00 a.m. to participate in the protests against the Unite the Right rally. According to witness statements, Heyer parked her car in the McDonald's parking lot. Steps away in the same parking lot, the defendant had parked his vehicle earlier that morning. Heyer had been hesitant to attend the rally because "someone might do something stupid and someone might die." (*Interview of M.B.*, 10/24/2017.) Nevertheless, Heyer decided to go because she believed – like M.B., M.M., and C.C – that it was important to show up and be counted in protest to white supremacy and racism.

Soon after the four friends met up, the group walked to the downtown pedestrian mall where they stopped at the bottom of the hill below the federal courthouse. They observed a large group of counter-protestors crossing over the downtown mall walking towards Water Street, and Heyer and the rest of her group joined in. They stopped briefly in the metered parking lot at the intersection of 2nd Street SW and Water Street, where they encountered white supremacists. Heyer saw that one of the individuals was female, and in a partially video-recorded encounter, Heyer attempted to strike up a dialogue with the woman to talk about their respective points of

view.  The woman did not want to engage with Heyer, replied "No Comment," and Heyer moved on.

At that point, Heyer, M.B., M.M., and C.C. observed another group of counter-protestors walking down Water Street towards Fourth Street and decided to join in with them.  M.B., M.M., and C.C. uniformly described the group as "happy," with some people playing music and dressed as clowns.  "It was like a parade.  It had drums, chanting, flags, and love.  You could feel the love from really good people.  The mood of the group was unified and peppy."  (*Interview of C.C.*, 1/9/18.)  The crowd reached the intersection of Fourth and Water Streets, where people began to shout "Go left!"  Soon thereafter, "I heard these tires screech.  I looked up and bodies were flying."  (*Interview of M.M.,* 10/24/17.)  M.M. pushed M.B. out of the way, but M.M. was struck by the defendant's vehicle, and was flipped backwards over it, landing on the pavement behind it, seriously injured.  C.C. was struck in the leg as the car accelerated past her into the crowd.

The defendant struck Heyer directly.  Forensic evidence and photographs confirmed that she struck the passenger side windshield of the defendant's vehicle.[4]  After hitting the windshield, Heyer flew backward and landed near the stop sign at the intersection of Fourth and Water Streets. Emergency medical technicians arrived quickly, rushed Heyer to the hospital, and initiated emergency efforts to stabilize her.  She died from her injuries shortly after her arrival to the emergency room, which included severe trauma to her throat and abdomen, a severe hemorrhage causing blood to drain into her chest cavity, respiratory failure, and multiple bone fractures.  The medical examiner determined Heyer's cause of death was blunt force injury to Heyer's chest and abdomen.  The manner of death was homicide.

---

4 Forensic technicians swabbed the passenger side windshield of the Dodge Challenger. Subsequent testing of those swabs confirmed the presence of blood and Heather Heyer's DNA.

In the pandemonium that followed, M.B. and C.C. had searched for Heyer, but could not find her. M.B. and M.M. were taken from the scene in an ambulance. At the hospital, M.B. provided Heyer's information to staff and law enforcement, at which point a detective informed her that Heyer had died. Immediately, M.B. called Heyer's mother.

M.M. suffered a broken ankle and a broken leg, among other injuries, and underwent extensive physical therapy. M.B. had a cut on her arm and a 14-inch bruise on her left leg. C.C. had a bruised bone and a torn meniscus. C.C. described herself as sleepless for about two months following the attack.

### 2. T.B. (Count 5)

T.B. is a local horticulturalist who, together with his wife, protested the Ku Klux Klan (KKK)'s July 2017 appearance in Charlottesville in order to support his community. For August 12, 2017, he decided to protest because "[t]hese people were bringing violence into my community. I wanted to be present."

After the unlawful assembly had been declared, T.B. saw the "parade" which he described as "[a] celebration due to protestors that had left. The mood had changed and it was only positive." (*Interview of T.B.*, 10/31/2017.) T.B. joined in the crowd, and he was at the front as they began walking up Fourth Street. He heard "loud thumps" and then "there were bodies in the air." T.B.'s head and shoulder hit the windshield and he was flipped into the air. As a result of the attack, among other injuries, T.B. sustained a concussion, a tear in his wrist, and a labral tear in his hip. His hip injury required surgery and the implantation of four screws and permanent sutures. An avid athlete prior to this attack, he continues to suffer physical effects from his injuries through the present day, and he cannot participate in many of the physical activities he enjoyed before the attack.

### 3. W.B. (Count 5)

Of the victims, W.B. had traveled the farthest to come to Charlottesville to protest racism. A white male from Ohio, W.B. grew up in a mixed-race household and had witnessed racism throughout his lifetime. Just prior to August 12, 2017, W.B. attended a seminar in Ohio about protesting the KKK at which a young woman spoke passionately about what had happened when the KKK had come to Charlottesville in July 2017. When he heard about the planned white supremacist rally on August 12, he decided that he had to attend as a counter-protestor. That morning, he woke up in darkness to drive alone to support of the Charlottesville community in protest.

At the time of the attack, W.B. was towards the front of the crowd walking up Fourth Street, which he described as "joyous" and chanting "Black Lives Matter" and "Down with the KKK!" He heard a car engine revving and then: "I started to hear screaming. I woke up on the ground." When he woke up, his body was right against Heather Heyer:

> I was in and out of consciousness. I tried to move, but I just couldn't get up. Screaming could be heard everywhere. I tried to keep my eyes closed. Someone took my hand and put it on my head and said: 'you need to close your head.' It didn't make any sense, but then I saw blood. That's when I gave up.

(*Interview of W.B.*, 2/2/18.) W.B. was rushed to the hospital, where he was diagnosed with a large laceration to his head, a crushed left arm, and a concussion. He still suffers from headaches and emotional trauma, for which he receives counseling.

### 4. N.L. and E.B. (Counts 7 and 8)

N.L., a 19-year-old Tanzanian refugee who had relocated to Charlottesville, went to the rally that day with her sister and her 14-year-old cousin, E.B. They had attended the July KKK rally because they wanted to see it for themselves, and previously had only heard about the KKK from history books. Their reasons for attending the August 12 rally were similar. "[We] went to the rally to see the community of Charlottesville stand up for itself." (*Interview of N.L.*, 3/15/2018.)

When they saw the "happy group with peaceful chanting and full of joy," they joined in. As they arrived at the intersection of Fourth and Water Streets, 14-year-old E.B. noticed the defendant's vehicle "at the top of the street, parked on the street . . . the next time I looked up, the car had disappeared, but then I saw that the car was coming back fast." (*Interview of E.B.*, 3/23/18.) E.B. screamed "watch out for the car" and tried to push N.L. out of the way. N.L. was struck so hard by the car that she came out of her shoes. E.B. was hit too, and she landed on the hood of the defendant's car as he crashed into the sedan.

In the aftermath, N.L. was in shock as she searched for her sister and her young cousin E.B., all while N.L. herself required medical attention for her serious injuries. After sliding off the hood, E.B. "couldn't feel my legs, my face was hurting, and there were people all around me. . . . I didn't want to go to the hospital because I couldn't pay for it." (*Interview of E.B.*, 3/23/18.) Regardless, the emergency medical technicians rushed her to Martha Jefferson Hospital. Several hours passed before N.L. learned what had happened to her young cousin.

N.L. suffered a damaged spleen, concussion, lumbar fracture, swollen left leg, bruises and abrasions. E.B. suffered from a brain bleed, and could not walk due to injuries to her right knee and left hip. To date, she still has pain in her hip, and she still undergoes physical therapy.

## 5. A.M. and N.M. (Counts 9 and 10)

A.M. and N.M, mother and daughter, took the bus to downtown Charlottesville because A.M. thought it was important for her 14-year-old daughter to observe the rally and the counter-protests. Their plan was to watch from a distance, and to leave if violence broke out. By the time they arrived on the bus, police had already declared an unlawful assembly. They observed a large group of people chanting with Black Lives Matter and LGBTQ signs, who "were people of all kinds" of color and background. "It was a joyful mood." (*Interview of A.M.*, 11/9/17.) A.M. and N.M. joined in.

As the group turned up Fourth Street, A.M. "thought a bomb had gone off. Next thing I knew, I was on the ground and I didn't know where [her daughter N.M.] was located." Fearing for her daughter's safety, A.M. walked around searching for her in the chaos after the attack, as she herself suffered from a compound leg fracture. Still, she could not find N.M. It was not until that evening, after A.M. underwent surgery, that A.M. saw her daughter again. A.M. learned that N.M. was also struck by the defendant's vehicle, and sustained a fractured elbow, cuts, scrapes, and other bruises. For a considerable portion of her recovery, A.M. was confined to a wheelchair.

### 6. C.A. (Count 11)

C.A. traveled from Richmond, Virginia to meet up with friends from the University of Virginia to protest white supremacy. She drove to Charlottesville the morning of the rally, and met up with a group of almost 100 people, most of whom were at or near college-age. C.A. was wearing a large blue bass drum with straps, which she had played that day as she marched in protest of the rally. After the unlawful assembly was declared, she and some friends retreated to McGuffey Park to cool down. When they heard that white supremacists were harassing residents at Friendship Court, they walked with the larger group in that direction. When that concern no longer presented itself, C.A. marched with the group towards the intersection of Fourth and Water Streets. On Fourth Street, in what happened so quickly that she had "no time to process it," C.A. was struck by the defendant's car and thrown to the ground. She noticed her friend, N.R. (Count 12), was bleeding profusely from the head. In the immediate aftermath of the attack, C.A. suffered from blurred vision, pounding headaches, vertigo, and multiple sprains. She was later diagnosed with a concussion. In addition to the physical injuries, she also suffered extensive emotional trauma.

### 7. N.R. (Count 12)

N.R., a Hispanic female from Colombia, had just returned to Charlottesville as an undergraduate at the University of Virginia. The night before, she had protested the torch-lit

march at the University of Virginia.  N.R. was part of the group that left McGuffey Park, and "when our group merged with another large group . . . it was a super happy, huge group." (*Interview of N.R.*, 1/26/18.)  She was struck by the defendant's car, but she did not see it.  On the ground, fearing she would get run over as the car reversed, N.R. later recalled:  "I knew that I needed to move or I was going to die."  *Id.*  Blood poured over her face as her friends attempted to provide first aid.  She later described it:  "I had to fight the feeling of wanting to go to sleep because I thought I would surely die."  *Id.*  N.R.'s injuries were of the most severe of the surviving victims:  a skull fracture, a broken tooth, vertigo, cuts, bruises, lacerations, and an inability to sleep or eat.  Due to the severity of these injuries, she was unable to complete a semester at school.

### 8.  M.A.N. (Count 13)

M.A.N., a fourth-year student at University of Virginia, had not planned on attending the August 12 rally, but when she saw what happened on the evening of August 11th, she was upset. She drove from Washington, D.C. to Charlottesville that morning to stand in opposition to white supremacy, and in support of Black Lives Matter and transgender persons.  She joined in with the crowd of counter-protestors for her own safety, and as the crowd turned onto Fourth Street, she and a friend – S.S. (Count 14) – saw each other, smiled, and embraced in a hug.  Moments later, M.A.N. "thought a bomb had gone off" and then "saw a grey car, backing up, dragging bodies." (*Interview of M.A.N.*, 1/31/18.)  "I wanted to crawl out of there, but I wanted to help.  So many people needed help."  (*Id.*)

Her shoulder was dislocated, her hand was cut, she had severe bruising, hip pain, and stretched tendons in her leg that caused her trouble walking for months.  The physical injuries did not compare to how the attack affected her in other ways, however:

> Mr. James Alex Fields Jr. violently penetrated the realities of many by physically marking dozens. . . . Blood spilled on Fourth Street in Charlottesville, my college town, and fear poured into my heart.  It pumped in my veins everywhere I went for too long of a time.

. . .
In my last year at the University of Virginia, I never stopped being afraid. Mr. James Alex Fields Jr. (and others who joined him) aimed to maim and terrorize people who differ from the Caucasian heteronormative norms to varying degrees . . . he seriously succeeded with me for a time. He filled my heart with such fears and anxieties and altered my very existence at the University of Virginia and beyond. The serious damage to my body and mind was impossible to reckon for too long.

M.A.N., *Victim Impact Statement,* 5/28/19.

### 9. S.S. (Count 14)

S.S. was also a student at the University of Virginia, and had also protested the torch-lit march on August 11 during which, in an atmosphere of violence and chaos, she held a banner "VA Students Act Against White Supremacy." S.S. was part of the large group of counter-protestors who left McGuffey Park and joined with the large crowd of people walking down Water Streets. After turning up Fourth Street, she greeted her friend M.A.N. and they hugged each other. Shortly thereafter, she was struck by the defendant in his vehicle, thrown up in the air and to the left side of the street, landing on the sidewalk. S.S. suffered from fractures in both legs, a concussion, and facial lacerations.

### 10. K.A., C.M., and M.R. (Counts 15 through 17)

C.M. and M.R., both college students, traveled from Richmond, Virginia, to Charlottesville on the morning of August 12 to join in the protest of white supremacy. Once in Charlottesville, they were joined by K.A., who attended college with C.M. After the unlawful assembly was declared, they were in Justice Park with other counter-protestors, and decided to join the group to lend support when they heard a low-income community was being harassed by white supremacists. When the group combined with counter-protestors from McGuffey Park, K.A. described the crowd as "celebratory with high energy and a joyous nature [that] was filled with people of color." (*Interview of K.A.,* 2/23/18.)

On Fourth Street, M.R. looked up and saw the defendant's car slowly backing up. "There was no one around the grey car." (*Interview of M.R.,* 4/19/18.) Moments later, C.M. "thought

bombs were going off but it was actually people getting hit by the car." (*Interview of C.M.*, 1/30/18.) M.R. saw two people get hit by the car before her, and then she was struck. "I got knocked up on the hood of the [defendant's] car, and then flipped off." (*Interview of M.R.*, 4/19/18.) K.A. saw "bodies flying" before she was struck and thrown to the ground. (*Interview of K.A.,* 2/23/18.)

K.A.'s right knee was shattered, with traumatized tissue on her inner thighs, and she experienced shock and considerable pain. M.R. suffered a concussion with a large laceration and contusion to her left leg, requiring stitches. C.M. suffered back pain and bruises on her knees and elbows.

### 11. A.H. (Count 18)

A.H., a college student, grew up locally and was home for the last two weeks of summer break before he returned to his university on the West Coast. A.H. identifies as both Persian and Muslim, and he decided to come to Charlottesville to protest white supremacy on both August 11 and August 12, 2017. He believed it was important to be a part of the counter-protest in order to protect his identity. Although A.H. has no memories of the attack itself due to his serious head injuries, A.H. remembered being part of the counter-protesting group walking on Water Street.

A.H. woke up in the hospital with no idea what had happened to him. A.H's only memories of the immediate aftermath of the attack are that he was unable to walk, he had blood dripping down his face, and he had a sense of "something being wrong," but he did not understand why. His injuries included a severe leg fracture that required surgery and the implantation of metal plates and screws, a severe concussion, and a deep laceration on his head. His injuries required extensive therapy and rehabilitation, including re-learning how to walk. During his rehabilitation, he was first confined to a wheelchair, then crutches, and finally a cane.

### 12. K.T. (Count 19)

K.T. and his 18-year-old daughter went as "observers" to the August 12, 2017 rally. K.T.,

who lives in the Charlottesville area, believed it was important to "stand up for my town." (*Interview of K.T.*, 12/8/17.) When K.T. and his daughter joined the crowd, the mood in the group was an "awesome jubilation" with an "air of happiness." As they made their way up Fourth Street, K.T. saw the defendant's car: "it looked like he was assessing . . . rolling slow." (*Id.*) Then, he heard the "thumping of bodies being hit" and saw "people flying over front bumper and hood of the car." (*Id.*) K.T. and his daughter dove out of the way, and K.T. suffered bruises and a broken toe.

### 13. S.L. (Count 20)

S.L. had just graduated from the University of Virginia, and lived in Charlottesville. The August 12 rally was the first protest S.L. had ever attended, but she felt it was important to be present in counter-protest to send a message to white supremacists. As a part of the group of counter-protestors that left Justice Park, she described the crowd – after it had doubled in size – as having "a positive vibe" and "people of color." (*Interview of S.L.*, 11/15/17.) After the crowd turned up Fourth Street:

> The sound I heard next will stay with me. Dozens of thuds in rapid succession. It was the sound of bodies hitting metal. . . . .we were under attack. . . . I knew my face was wet with blood. I was in shock, and I did not know what happened to me. There was a moment I thought I could be dying.

*Victim Impact Statement*, S.L., 6/1/19. S.L. was struck so hard by the car she came out of her shoes, and her body was thrown at least ten feet backward. Her face hit the ground hard, and she temporarily lost vision in one eye. She received a large laceration to her forehead requiring 11 stitches, a concussion, a sprained ankle, bruises, and scrapes. "Of course, pain is not only physical, and the mark Fields left on me cuts much deeper than the scar on my forehead." *Id.* "I am forced to re-live August 12th every time I walk past Fourth Street. . . . He saw people he hated, and he decided to try to kill them." (*Id.*)

### 14.   C.Y. (Count 21)

C.Y. lived and worked in Washington, D.C., and on the morning of August 12 she traveled to Charlottesville with other counter-protestors to protest hate and racism.   C.Y. had intended to remain within McGuffey Park, where members of the clergy spoke and people were singing. After the unlawful assembly was declared, C.Y. believed that the day was winding down, and she joined fellow counter-protestors on a march in downtown Charlottesville to show support for a low-income community.   C.Y. had felt intimidated and scared most of the day, but during this march she felt safe.   She recalled, "People were hugging, being nice and positive." (*Interview of C.Y.,* 2/16/18.)   Out of nowhere, she heard the sound of multiple impacts, "saw bodies flying and then found herself hurting and on the ground."   (*Id.*)   She blacked out when she got hit by the defendant's car, but recalled people scream "He's reversing!"   "The scene was pandemonium." (*Id.*)

C.Y. needed crutches to walk for two weeks after the attack, and sustained serious bruising on her hip.   Like many other victims, C.Y. suffered substantial emotional trauma as well, as expressed in her Victim Impact Statement.

### 15. L.Q. (Count 22)

L.Q. had traveled several hours to Charlottesville with other counter-protestors to protest oppression and to celebrate equality.   All day long, she wore a sandwich-board sign that stated: "End Sexism, Racism, Heterosexism, Speciesism."   L.Q. described the crowd at the intersection of Fourth and Water Streets as "cheering and celebrating" and "standing with people against racism."   (*Interview of L.Q.,* 12/14/17.)

When L.Q. was struck by the defendant's car, she went flying through the air, over the top of the sedan where the defendant had crashed, and finally came to rest on the windshield of that vehicle.   Her injuries were some of the most severe among the surviving victims.   Both of her legs were broken below the knee, her hand was broken in multiple places, and she suffered facial

lacerations.  She required surgery on both of her legs, and permanent metal plates and screws were implanted in her left leg.  Her hand injuries required two surgeries, also required the implantation of metal plates and screws, and through the present she has lost considerable strength and fine motor control in her hand.  Before the attack she had no problems with her legs but she now walks with a cane.

### 16.  T.W. and M.W.   (Counts 23 and 24)

Two sisters, T.W. and M.W., moved to Charlottesville from Jackson, Mississippi, years ago.  On August 12, they did not plan to protest; rather, they were in T.W.'s Toyota Camry sedan driving to Friendship Court to visit with friends.  As they were driving in downtown Charlottesville, they noticed that certain streets were blocked.  While navigating these streets on their way to Friendship Court, both T.W. and M.W. saw the defendant's car behind them.

T.W. and M.W. slowly proceeded down Fourth Street when they observed a van that was stopped at the stop sign at the bottom of the hill, at the intersection of Fourth and Water Streets. They noticed a large crowd of people at the same intersection, and realized that they were "stuck." T.W. noticed the defendant's car backing up in her rear-view mirror back to the top of the street, and for a moment, she considered doing the same.

But, T.W., who is African-American, was overcome by her observations of the crowd.  "I was just staring . . . [I had] never seen so many white people standing up for black people." (*Interview of T.W.*, 12/6/17.)  As she and her sister looked at the crowd – "amazed, excited, and surprised" – they viewed the crowd as non-threatening.  (*Id.*)  Not a single person bothered them or their vehicle.  To the contrary, a couple of people came to the window and apologized and thanked T.W. and M.W. for their patience as they waited for the crowd to pass.

Suddenly, as the defendant drove his car through the crowd of people and squarely into the rear of T.V.'s vehicle, M.W. was slammed against the dashboard.  T.W.'s head slammed against the steering wheel, and both sisters saw a woman fly over their car and land on their windshield

28

(L.Q.). T.W.'s legs felt as if they were on fire, and as she exited her vehicle, medical technicians took both her and M.W. to the hospital.

T.W. had a broken ankle, a head injury, and still suffers from back pain. M.W. did not appear injured, but her response to the incident would come later. She was diagnosed with Post-Traumatic Stress Disorder and experienced trouble concentrating. At other times, she suddenly would come to the realization that she had started crying.

### 17. B.H. (Count 25)

Charlottesville native and public servant B.H. attended the August 12 rally because he wanted to bear witness to "4,000 people in your town telling you that you don't belong and that they hate you." (*Interview of B.H.*, 10/31/17.) B.H., who is African-American, wanted to be present in non-violent protest against people who found him inferior merely because of his color. When he saw the parade of individuals walking along Fourth Street, some of whom were engaging in an impromptu rendition of the song "Lean on Me," he decided to video-record some of the events with his phone. At the intersection of Fourth and Water Streets, B.H.'s phone briefly pointed towards the pedestrian mall, up Fourth Street, and it captured the defendant in his vehicle, stationary, above the crowd.

As B.H. made the turn onto Fourth Street, he saw a friend – L.S. (Count 26) – who was driving the van stopped at the bottom of the intersection with her family inside. L.S. had stepped outside to film the crowd, and B.H. greeted her. As he walked up Fourth Street with the celebratory crowd, B.H. saw someone in front of him jump out of the way of the defendant's approaching car, which gave him just enough notice "to try and get up on the car" to avoid the attack. (*Interview of B.H.*, 10/31/17.) As B.H. tried to jump in the opposite direction of the defendant's car, he "could hear the car revving." (*Id.*).

Despite his best effort to escape, B.H. was hit so hard he also was knocked out of one of his shoes, thrown into the air, and landed on the curb. He immediately felt "woozy" and he

noticed something was not right with his arm.   He was placed into an ambulance with S.S. (Count 14), who he immediately recognized to be in critical condition.   B.H. prayed that S.S. would live on the way to the hospital.   There, doctors diagnosed B.H. with a dislocated shoulder, multiple fractured ribs, and a severed bicep and tricep.   His bicep injury required surgery, and he underwent extensive physical therapy.   He has not regained a full range of motion in his affected arm.

### 18.   L.S., M.J, A.J, and A.R. (Counts 26 through 29)

On August 12, L.S. was running errands in her purple minivan with her 10-year-old daughter, A.R., her five-year-old granddaughter, A.J., and her 22-year old god-daughter, M.J. L.S. and M.J. had known about the rally and, when they were in the area, they decided to make a quick detour through downtown "to see what it was all about." (*Interview of L.S. and M.J.*, 4/18/18.)   "We wanted to experience the history of the day, but from a safe distance." (*Id.*) The road closures guided them down Fourth Street to the intersection of Fourth and Water Streets, where they noticed "a happy crowd" with "singing and dancing" come marching up Water Street towards them.

L.S. got out of her vehicle because she wanted to record the moment with her phone. Shortly after she walked to the front of her van, she heard screaming.   "The next thing I know, my own vehicle is coming right at me." (*Id.*)   L.S. was struck so hard she landed on the hood and hit her head on the windshield, causing her to lose consciousness.   M.J., A.J., and A.R. were all inside the van when it was struck from behind.   The van had been hit so hard that its doors were jammed shut, and it was not until additional people assisted that they could open the doors to get the children out of the vehicle.

L.S.'s 10-year-old daughter, A.J. received extensive counseling and therapy.   "She is still scared when the vehicle makes sudden stops.   This will be with her forever."

### 19.   W.B. and J.P.

Had this case proceeded to trial, the government anticipates that it would have sought a

superseding indictment to include at least two additional victims: W.B. and J.P. As noted in the Presentence Investigation Report, these two individuals suffered some of the most severe injuries among the surviving victims.

W.B. had traveled to Charlottesville to protest white supremacy both on the evening of August 11 on the University of Virginia grounds and at the August 12 rally. W.B. had joined the crowd walking down Water Street, where she felt safe. When the defendant accelerated down Fourth Street, W.B. heard a scuffle of people trying to get out of the path of his car, and she was able to avoid him. The defendant's car plowed into the first wave of people and crashed into the back of the vehicle at the bottom of the hill. W.B. saw what happened and ran to the car to help the people who had been struck, at which time the defendant put his car in reverse. As the defendant accelerated backward, he hit W.B. in her stomach and with such force that she was briefly carried backward on the trunk of the defendant's vehicle as he fled the scene. When W.B. fell off the side of the defendant's car, she was wedged between it and a parked truck. W.B. had a shattered pelvis, fractured orbital socket and cheekbones, broken spinal bones, a broken arm, and numerous abrasions. When the force of the defendant's car broke her pelvis, a shattered piece of bone severed one of her arteries and she sustained life-threatening internal bleeding that required emergency surgery. These injuries continue to impact her every-day life: her gait has been permanently affected, which in turn causes her back pain, and she is unable to walk long distances or to sit for long periods without pain.

J.P. lived in the Charlottesville area and had attended other protests against white supremacy in the summer of 2017. She described the large crowd on Fourth Street – of which she was part – as big and joyful. As the defendant's car plowed into the crowd, she was struck. After the impact, she tried to get out of the street but could not move her legs. Immediately, she yelled for help and a stranger pulled her out of the street and onto the sidewalk. She was transported to the hospital, where she was diagnosed with, among other injuries, a fractured left

leg, a broken right leg, two injured locations on her spine, and multiple bruises. She has undergone five surgeries on her legs, and after one of her surgeries she developed a serious infection that required an additional hospitalization and surgery. She was confined to a wheelchair for an extended period of time, and the effects of these injuries continue to impact her everyday life.

### III. THE PLEA AGREEMENT AND STATUTORY PENALTIES

On June 27, 2018, following an extensive federal investigation, a federal grand jury indicted the defendant on thirty hate crime charges for the car attack. On March 26, 2019, the defendant pleaded guilty to Counts 1 through 29 of the Indictment, which charged him with 29 counts of violating 18 U.S.C. § 249 (a)(1) (Hate Crime Acts), that is, willfully causing – or attempting to cause with a dangerous weapon – bodily injury to any person because of the actual or perceived race, color, religion, or national origin of African Americans, Jewish people, and others he perceived to be non-white in the crowd gathered at the intersection of Fourth and Water Streets. Count One charged the defendant with the murder of Heather Heyer, and accordingly, included an additional allegation that the defendant's conduct resulted in her death. Counts 2 through 29 charged the defendant with causing – or attempting to cause with his vehicle – bodily injury to 28 other victims that were in the same crowd. These counts included an additional allegation that the offenses included an attempt to kill. In exchange for his agreement to plead guilty to Counts 1 through 29, the government agreed to dismiss Count 30, the capital-eligible count, which charged a violation of 18 U.S.C. § 245(b)(2) (Bias Motivated Interference with a Federally Protected Activity Resulting in Death).

Each of the 29 counts to which the defendant has pleaded guilty carry the same maximum penalty: a term of life imprisonment, a $250,000 fine, a term of five years of supervised release, and a $100 special assessment.

## IV.   DETERMINING THE SENTENCES TO BE IMPOSED.

In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court held that the United States Sentencing Guidelines are no longer mandatory.   However, "[a]s a matter of administration and to secure nationwide consistency, the Sentencing Guidelines should be the starting point and the initial benchmark" for determining the defendant's sentence. *Gall v. United States*, 552 U.S. 38, 49 (2007).   While, to be sure, "[i]n accord with 18 U.S.C. § 3553(a), the Guidelines, formerly mandatory, now serve as one factor among several courts must consider in determining an appropriate sentence," *Kimbrough v. United States*, 552 U.S. 85, 90 (2007), it remains the case that "the Commission fills an important institutional role: It has the capacity courts lack to 'base its determinations on empirical data and national experience, guided by a professional staff with appropriate expertise.'" *Id.* at 108-09 (*quoting United States v. Pruitt*, 502 F.3d 1154, 1171 (10th Cir. 2007) (McConnell, J., concurring)). The Supreme Court "accordingly recognized that, in the ordinary case, the Commission's recommendation of a sentencing range will 'reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives.'" *Id.* at 109 (*quoting Rita v. United States*, 551 U.S. 338, 350 (2007)).   As the Fourth Circuit has recognized, in the wake of *Booker*, a sentencing judge is required to engage in two-step analysis to determine a reasonable sentencing:

> [A] district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines. Then, the court shall consider that range as well as other relevant factors set forth in the guidelines and those factors set forth in § 3553(a) before imposing the sentence.

*United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005).

When weighing the section 3553(a) factors as part of its determination of an appropriate sentence, the Court should consider not only the nature and circumstances of the offense and the history and characteristics of the defendant, but also the applicable sentencing objectives — that is, that the sentence: (1) reflect the seriousness of the offense; (2) promote respect for the law; (3) provide just punishment; (4) afford adequate deterrence; (5) protect the public; and (6) effectively

provide the defendant with needed educational or vocational training and medical care. *See* 18 U.S.C. § 3553(a)(1) and (2). In addition, the sentence should reflect "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).

## V.   GUIDELINES ANALYSIS

As set forth below, the defendant's offense level under the United States Sentencing Guidelines was correctly calculated to be a 48, which is to be treated as a 43. An offense level 43 – even in the absence of any criminal history – corresponds to a guideline sentence of life imprisonment. Even if the defendant's offense level were not already at the maximum, an upward departure would be warranted on several bases, as discussed below.

### A.   Guidelines Calculation

The defendant pleaded guilty to 29 hate crimes in violation of 18 U.S.C. § 249(a)(1), one count for each of the 29 victims that were charged in the indictment. Pursuant to USSG § 3D1.2(a), the offenses should not "group" as "closely related counts" because although the counts all occurred during the same course of conduct – *i.e.,* the defendant driving into a crowd of people – each count relates to a distinct victim. *See* USSG. § 3D1.2, comment. (back'd.) ("Cases involving injury to distinct victims are sufficiently comparable, whether or not the injuries are inflicted in distinct transactions, so that each such count should be treated separately rather than grouped together."). Therefore, each count for each victim represents its own "group."

Pursuant to USSG § 3D1.4(a), Count One – which charged the defendant with a Hate Crime Act resulting in the death of Heather Heyer – has the highest offense level of 46 and constitutes the first unit. This offense level was calculated by § 2H1.1's cross-reference to § 2A1.1's First Degree Murder guideline of 43, plus 3 points from the application of § 3A1.1, the Hate Crime Motivation enhancement.[5] For each of the Counts 2 through 29 – which charged

---

[5] The defendant stipulated in his plea agreement that these two guideline provisions apply to his conduct.

Hate Crimes Acts involving an independent victim and including an attempt to kill – that count also constitutes its own "group" and may qualify as an additional one-half unit depending on the extent of the injury.[6]   Because of the number of victims and the extent of their injuries, Counts 2 through 29 result in a combined total of 10 units, in excess of the 5-unit maximum.   Section 3D1.4 provides that the most that can be added to the initial offense level 46 is 5 levels for a combined offense level of 51.

Because the defendant pleaded guilty, he receives a three-point reduction for acceptance of responsibility, resulting in a total offense level of 48.   However, because the Sentencing Table's ceiling is offense level 43, in such "rare cases" where an offense level is even higher, it nevertheless is to be treated as offense level 43.   *See* USSG Ch. 5, pt. A.   An offense level of 43 – even in the absence of any criminal history – corresponds to a guideline sentence of life imprisonment.   *Id.*

> **B.  If the defendant were not already at the maximum offense level, an upward departure would be warranted due to the extraordinary number of actual and potential victims of the defendant's crimes.**

The Guidelines appropriately score the defendant as the highest possible offense level available at 43 with the applicable guidelines sentence of life imprisonment.   Nevertheless, if that were not the case, the government would request that the Court depart upward based on two factors:   First, the Guidelines do not account for the extraordinary number of attempted homicides

---

Plea Agreement, at 3 (Dkt. #42).

[6] Pursuant to USSG § 2A2.1(a), the base offense level for Attempted Murder where the object of the offense would have constituted first degree murder begins at 33.   However, pursuant to § 2A2.1(b)(1), the base offense level is increased by another 2-4 levels depending on the degree of bodily injury sustained by the victim.   Accordingly, as to each victim, the offense level will range from 33 to 37 (before application of 3-point hate crime enhancement, which has no effect on the grouping analysis and unit calculation because it applies to all 29 counts).   If a victim suffered "serious bodily injury" "permanent or life-threatening bodily injury," or somewhere in between, the adjusted offense level for each such § 249 count is 35 to 37 and qualifies as one-half unit under § 3D1.4(b) because it is its own group and is 5 to 8 levels less than the highest offense level for the lead count (Count One), or 43.   If a victim did not suffer "serious bodily injury," the adjusted offense level for each such § 249 count is 33 and does not qualify as any additional units because it is 9 or more level less serious than the level 43 for Count One.   In other words, for every one of defendant's victims that did not suffer "serious bodily injury" as that term is defined, there is no effect on his guideline range.

committed by the defendant. Second, the Guidelines do not account for the substantial risk of death or serious bodily injury to a large number of people. The government finds it important to highlight these criteria for an upward departure, even if they are practically inapplicable due to the defendant's offense level already being at its maximum.

> **1. The Guidelines' calculation does not account for the extraordinary number of attempted homicides and the extent of the harm caused by the defendant.**

The Guidelines provide for an upward departure where, as here, the case involves an aggravating factor "to a degree not adequately taken into consideration" by the Guidelines. USSG § 5K2.0(a). As the Guidelines explain further:

> Departures Based on Circumstances Present to a Degree not Adequately Taken into Consideration. – A departure may be warranted in an exceptional case, even though the circumstance that forms the basis for the departure is taken into consideration in determining the guideline range, if the court determines that such circumstance is present in the offense to a degree substantially in excess of, or substantially below, that which ordinarily is involved in that kind of offense.

USSG § 5K2.0(a)(3). While the number of victims is "taken into consideration" by the applicable Guideline (USSG. § 3D1.4), in this case, the number of the defendant's victims "is present in the offense to a degree substantially in excess of . . . that which ordinarily is involved in [this] kind of offense." USSG § 5K2.0(a)(3). The criminal conduct committed by the defendant is so exceptional that the Guidelines fail to account for the number of the defendant's victims in two ways.

First, because each count of conviction relates to a separate victim, the counts do not group under Chapter 3 of the Guidelines. The applicable guideline for determining the increase to a defendant's offense level to account for non-grouping counts is USSG § 3D1.4. Pursuant to § 3D1.4, the defendant has 10 units for the victims. The applicable guideline, however, provides for a maximum of 5 units and a corresponding 5-level increase to the defendant's offense level. Accordingly, the Guidelines do not adequately reflect the gravity of the defendant's offenses, as his total number of units (10) was double the maximum accounted for by the Guidelines (5).

The Guidelines commentary recognizes this: "Inasmuch as the maximum increase provided in the guideline is 5 levels, departure would be warranted in the unusual case where the additional offenses resulted in a total of significantly more than 5 units." USSG § 3D1.4, Background; *United States v. Lente*, 759 F.3d 1149, 1154 (10th Cir. 2014) (affirming upward departure in an involuntary manslaughter case where, "the district court concluded that the Guidelines did not adequately account for the multiple fatalities involved in the crash, describing this as perhaps the most important factor in its decision to vary upward").

Additionally, upward departures based on the number of victims have also been imposed in a number of other contexts. *See, e.g., United States v. Menzer*, 29 F.3d 1223, 1234-35 (7th Cir. 1994) (affirming upward departure in arson case, where "the Guidelines base level of thirty-three failed to take into consideration multiple deaths"); *United States v. Calloway*, 116 F.3d 1129, 1136 (6th Cir. 1997) (aircraft piracy case involving multiple injured victims); *United States v. Munoz-Tello*, 531 F.3d 1174, 1188 (10th Cir. 2008) (alien smuggling case involving four deaths); *United States v. Fei*, 225 F.3d 167, 172 (2d Cir. 2000) (alien smuggling case involving six deaths and injuries to numerous other people).

Second, as explained in footnote 6, *supra*, the defendant's guidelines do not take into account many of the defendant's victims because a number of the groups are 9 or more levels less than the group with the highest offense level, which is first degree murder with an offense level of 43. *See* USSG § 3D1.4(c). Specifically, pursuant to USSG § 3D1.4(c), the defendant's offense level does not account for 10 victims (Counts 2, 4, 16, 19, 21, 24, and 26-29). The defendant's adjusted base offense level, therefore, does not adequately reflect the gravity of his crime – the true level of carnage he visited upon the innocent people at the intersection of Fourth and Water Streets in Charlottesville.

The Guidelines commentary recognizes this as well:

In unusual circumstances, the approach adopted in this section could produce adjustments for the additional counts that are inadequate or excessive. If there are

several groups and the most serious offense is considerably more serious than all of the others, there will be no increase in the offense level resulting from the additional counts. Ordinarily, the court will have latitude to impose added punishment by sentencing toward the upper end of the range authorized for the most serious offense. Situations in which there will be inadequate scope for ensuring appropriate additional punishment for the additional crimes are likely to be unusual and can be handled by departure from the guidelines.

USSG § 3D1.4, (back'd). The Eighth Circuit addressed this in *United States v. Brown*, 287 F.3d 684 (8th Cir. 2002). In *Brown*, the defendant was convicted of one count of assault resulting in serious bodily injury and three counts of assault resulting in serious bodily injury to a child. *Id.* Pursuant to USSG § 3D1.4(c), the latter three convictions were disregarded from the calculation of his offense level. *Id.* at 688. Accordingly, the district court departed upward, and the Eighth Circuit upheld the departure: "We could not agree more with the sentiment of the district court. The operation of guideline § 3D1.4 entirely withdrew from the combined offense level computation three separate counts of assault to a defenseless toddler." *Id.* at 689. Here, however, the discounting of counts under § 3D1.4(c) is even more severe: as opposed to withdrawing three separate counts from the calculation, here the operation of § 3D1.4, ignores the defendant's convictions for 10 counts—meaning, the defendant's attempt to kill 10 of his victims is entirely discounted from his Guidelines calculation. All of these counts involved the wounding or the attempt to kill of innocent civilians engaged in protest. If the defendant's Guidelines were not already life imprisonment, an upward departure would be warranted to account for the complete scope of his crimes.

**2. The Guidelines' calculation does not account for substantial risk of death and serious bodily injury to a large number of people.**

Although 29 victims were included in the federal indictment, the number of charged victims could have been far greater given the substantial risk of death and serious bodily injury the defendant's conduct imposed on a large number of people. The Guidelines recognize that such circumstances may warrant an upward departure. Section 2A2.1, the relevant guideline for Attempted Murder that applies to Counts 2 through 29, provides: "Upward Departure Provision.

If the offense created a substantial risk of death or serious bodily injury to more than one person, an upward departure may be warranted." USSG § 2A2.1, comment. (n.1).

It is beyond dispute that the defendant's offenses created a substantial risk of death and serious bodily injury to an extraordinarily large number of people. Video and witness accounts show that a large crowd was present at the Fourth and Water Streets intersection, and this evidence establishes that the defendant's vehicle only stopped because it slammed into the two vehicles that had parked at the bottom of the hill. At such a high rate of speed, had those two vehicles not been there to shield the people present in the intersection from the defendant's car, the defendant would have continued plowing through the entire crowd, mowing down dozens of additional victims. Accordingly, if his Guidelines calculation were not already at the maximum offense level 43, this Court would have yet another basis upon which it could – and should – upward depart.

In sum, the government recognizes that an upward departure is not available here because the defendant's guideline calculation appropriately scores him at the maximum offense level, 43. Nevertheless, if that were not the case, an upward departure would be warranted due to the extraordinary number of actual and potential victims to the defendant's crimes and the substantial risk of death and serious bodily injury posed by the defendant's conduct to the members of the crowd at Fourth and Water Streets. Significantly, the gravity of defendant's crimes is so significant, even a sentence at the top of the Guidelines does not fully account for the magnitude of his conduct.

### C. The Guidelines expressly provide that a downward departure is not appropriate in this case.

The relevant guideline for the Hate Crime Act Resulting in Death (Count One) is Section 2H1.1, "Offenses Involving Individual Rights," which cross-references the "offense guideline applicable to any underlying offense." For Count One, that underlying offense (as stipulated by the parties in the plea agreement) is § 2A1.1, "First Degree Murder," and provides a base offense level of 43 – the maximum. The Commentary makes clear:

> In the case of [a] premeditated killing, life imprisonment is the appropriate sentence if a sentence of death is not imposed. A downward departure would not be appropriate in such a case.

USSG § 2A1.1, comment. n.2(A). Because "[s]ection 2A1.1, comment (n.2(A)) of the Sentencing Guidelines expressly provides that life imprisonment is the appropriate sentence for a premeditated killing," *see United States v. Poole,* 451 Fed. Appx. 298 (4th Cir. 2011), this Court should reject any request by the defendant for a sentence of less than life imprisonment.

### VI. The Factors in 18 U.S.C. § 3553(a) Demand the Imposition of a Life Sentence.

#### A. The nature and circumstances of the offense warrant a life sentence.

On August 12, 2017, the defendant, having traveled overnight all the way from Ohio to participate in a rally intended to promote white supremacy, sat alone in his Dodge Challenger watching the crowd. He saw a huge crowd celebrating diversity and racial equality. By all accounts, the crowd was peaceful, non-threatening, happy, joyous, jubilant, and filled with many people of color. There was no one around him. There was no one behind him. There was no reason why he could not have reversed his car back onto Market Street and returned to Ohio.

The defendant made a different decision. The crowd angered him. They stood for everything that he had grown to hate, and he viewed them as the enemy. He placed his car in reverse and began to slowly drive backward, over the downtown mall and to the top of Market Street. Again, there was no one around him. Again, there was no reason why he could not have reversed just a few feet farther onto Market Street, turned away, and returned to Ohio.

Again, the defendant made a different decision. At the top of the hill, the defendant put his car in drive. Motivated by his hatred of African Americans, Jewish people, and anyone he considered non-white, he pressed the gas pedal and accelerated down the hill. He was traveling so fast that the undercarriage of his car slammed into the small incline as the entrance to the downtown mall, breaking off a piece of his vehicle's undercarriage, sending his car airborne, and causing him to briefly lose control. He briefly tapped his brakes as he crossed the mall, re-gained

control, and accelerated again into the crowd of people, striking one person after another, and only stopping when his car was blocked by crashing into two other vehicles.

The death, injuries, and pain and suffering of the victims establish the depravity of the defendant's conduct and the dire consequences it caused. The murder of Heather Heyer and the physical injuries of the survivors – the sheer number of broken bones, lacerations, and concussions – easily justify the imposition of a life sentence. But the defendant's crimes cut so much deeper than physical injuries. As one victim stated:

> It is a monumental task for me to take inventory of all the ways your violence has impacted my life and harmed me. As I write this statement, I am struggling to find words comprehensive enough to adequately convey to you and this court the various manifestations and magnitude of grief that I now carry and will for the rest of my life. My sense of safety is gone. . . . My outlook on life is marred with a depression that is relentless and inescapable. I have invested hundreds of hours in therapy and yet the depression remains. The anhedonia that I regularly experience makes living in this body a burden. This is the terrible price I have to pay for your reckless decision. My PTSD prohibits me from fully showing up and being present in many situations. . . . My sleep is regularly disturbed due to experiencing nightmares where the sounds of your attack startle and paralyze me. Oftentimes I still wake up sweaty and am repugnantly reminded of what the screams of maimed and terrorized people sound like. [The defendant's] actions have rocked me to the core and have left me feeling hopeless and desperate for a way to return to my baseline before the attack.

*Victim Impact Statement of C.Y.*, 5/30/19. The emotional devastation described by this victim is not unique and not limited to her experience. This sentiment and fear resides with most of the victims included in the federal indictment. Its impact is ongoing.

This emotional trauma is not limited to those who ended up in hospitals or with their initials stated in an indictment, however. When interviewed by the agents of the Federal Bureau of Investigation, many of the victims described the attack as if a bomb had gone off. In a sense, it did. Everyone in the crowd at Fourth and Water Streets who witnessed the attack still carries the heavy emotional burden of having witnessed such a traumatic event and its aftermath. Charlottesville residents saw their home turned upside down by hatred, culminating in the defendant's attack on innocent civilians. People throughout the country and world saw the

defendant's attack on television and were forced to confront the fact that white supremacy and hate crimes are more prevalent than some would like to believe, and that acts of domestic terrorism can occur anywhere – even places like Charlottesville, Virginia.

Finally, if the physical and emotional devastation wrought by the defendant were not enough, the defendant's motivation for the attack leaves no doubt of the unusually grievous nature of this offense.   The defendant's crimes were not motivated by personal gain, addiction, or greed. The defendant did not attack the crowd out of fear or self-defense.   This was a calculated and deliberate act of terror motivated by the defendant's deep-seated hatred of others.   When the defendant drove into the crowd, he not only attempted to commit a mass murder, he attempted to commit a mass hate crime murder.   When the defendant struck and killed Heather Heyer, he did not only commit murder, he committed a hate crime murder.   The death of an innocent woman, the multitude of physical injuries suffered by the victims struck in his attack, and the vast emotional trauma this crime caused in Charlottesville and across the nation – all of this was born of the defendant's rejection of the fundamental American value that all persons are created equal. Accordingly, the only appropriate sentence warranted by the nature and circumstances of such an offense is life imprisonment.

## B. The Defendant's History and Characteristics Also Weigh Strongly In Favor of a Life Sentence

The defendant has demonstrated that he feels no remorse for plowing his vehicle into a crowd full of innocent civilians, killing Heather Heyer and injuring scores more.   At least two examples make this clear:  First, on December 7, 2017, while the defendant was incarcerated pending his state trial at the Albemarle County Regional Jail, he brought up the topic of the decedent's mother during a telephone call with his own mother:

Fields:          Her mother is going around, doing speeches and shit, slandering me.
                 Bunch of commies.

Mother:          I hadn't heard anything.

| | |
|---|---|
| Fields: | [unintelligible] . . . on the radio. |
| Mother: | The only thing I had seen was that she was on the news and she . . . |
| Fields: | She's going around doing speeches and shit. She's one of those anti-white communist c**ts. |
| Mother: | She lost her daughter, so, you know. |
| Fields: | It doesn't fucking matter – she's a communist! She's the enemy. |
| Mother: | You need to stop talking, nobody is the… |
| Fields: | She is a communist. An anti-white, liberal.… |
| Mother: | I don't know, Jay. |
| Fields: | It's not up for questioning … she is. She's the enemy. |
| Mother: | Nobody is the enemy. |
| Fields: | She is the enemy. She is the enemy, mother. Stop fucking questioning me. |

In the months after Heather Heyer's murder, her mother had made several public speeches about the murder of her daughter and the importance of standing up against racial and other forms of discrimination. Yet the defendant, four months after he killed Heather Heyer, viewed her mother as "anti-white" and "the enemy." In his own words, after months of time to reflect upon his actions, the defendant believed that Heather Heyer's death "doesn't fucking matter." Why? Because to the defendant, Heather Heyer – just like her mother – was the enemy.

Second, just six weeks ago, on May 15, 2019, Heather Heyer's mother testified before the U.S. House of Representatives' Committee on Oversight and Reform about white supremacist violence and the reporting of hate crimes and domestic terror. Meanwhile, the defendant sat at the Central Virginia Regional Jail listening to the news, which mentioned the testimony. In a recorded phone call later that day, the defendant stated "that girl's mother is talking to the Dems again, Congress, trying to get anti-white legislation passed." This conversation makes clear that, almost two years after killing Heather Heyer, the defendant still believes Heyer's mother to be

"anti-white." And, of course, this conversation confirms that even after he accepted responsibility for murdering Heather Heyer before this Court during his March 27, 2019 plea hearing, he continues to feel no remorse whatsoever for his crimes.

To be clear, in light of the defendant's history, one would not expect him to feel remorse for his actions on August 12, 2017. As mentioned previously, the defendant has been advocating for violence in the name of white supremacy since high school, including "violence in the streets" and "violence towards the groups" of non-white individuals he so reviled. He laughed in the face of an African-American female classmate in high school who sobbed when he asked her "when are you going to come over and pick my cotton?" This was just one episode of his racial harassment. On a trip to Europe, the defendant came alive when they visited a Nazi concentration camp where Jews were exterminated by the thousands, claiming "this is where the magic happened" and acting like a "Like a kid at Disney World. Like he was loving it." The defendant feels no remorse for attacking a crowd of people who were promoting racial equality and protesting white supremacy and racial discrimination. In his view, he attacked the enemy.

The defendant does have a history of mental-health issues that were diagnosed when he was younger, and that sometimes manifested in fits of rage and physical violence throughout his youth, often against his mother. In his most recent psychological evaluation prior to this incident, in January 2012, he was found to have depressive disorder, oppositional defiant disorder, parent-child relational problem, and anti-social traits. Therapists have also diagnosed the defendant with intermittent explosive disorder, mood disorder (not otherwise specified), attention deficit/hyperactivity disorder, and schizoid personality disorder. However, despite having been prescribed psychiatric medication for years to help him with these problems, and having seen its positive effects on him, the defendant chose to stop taking any medication at all once he turned 18 – two and a half years before this offense, which he committed after he had turned 20 years old.[7]

---

[7] The defendant has submitted, among other documents, a declaration from developmental psychologist

Moreover, the defendant's submission regarding his psychiatric history is of no moment. To the extent it can be viewed as somehow mitigating, the defendant has proven that he has sought to manipulate his psychiatric evaluators and their conclusions throughout the pendency of his prosecution. On August 24, 2018, in a recorded jail phone call, the defendant told his mother that his lawyers were "thinking that there isn't a static pattern of me being constantly explosive so I need to reaffirm that." Three days later, on August 27, 2018, after speaking with a different psychiatric evaluator, the defendant lamented that "I didn't really explain things well enough" and that "I was trying to not like incriminate myself so I kind of like skewed it a bit so now I need to unskew it." Moreover, putting aside his attempts to manipulate his psychiatric evaluations to achieve the results that he wanted, the defense has redacted the most relevant portion of his statement to the evaluator where he spoke about his actual offense conduct on August 12, 2017.[8] Without this information, it is impossible for the Court or the government to assess the validity of any conclusions reached during that evaluation.

In any event, the defendant's mental health does not provide a basis for departure since he has not shown that (1) he committed the offense while suffering from a significantly reduced

---

Dr. Laurence Steinburg regarding the development of the adolescent brain. In this declaration, Dr. Steinburg, who did not interview the defendant or conduct any tests or evaluations—and who almost certainly was not informed of the defendant's stunningly callous and unremorseful statements months after the incident—opines that because Fields was 20 years old at the time of his terrorist acts, he should not be assigned the same degree of culpability as a more mature or responsible adult. This opinion is unpersuasive for myriad reasons. First although the Supreme Court has cited studies regarding adolescent development in striking down, on constitutional grounds, the death penalty and mandatory life sentences for juveniles, the Court has never extended this reasoning to overturn similar sentences for adults. Second, Fields actions simply do not fit into Steinburg's paradigm regarding the common traits of adolescent offenders.

8 The government contests the defendant's assertion that these redactions are necessary to protect his Fifth Amendment rights; to the extent that the defendant voluntarily submitted to these examinations to obtain mitigation evidence, the government is entitled to use those complete reports for rebuttal purposes. *Buchanan v. Kentucky*, 483 U.S. 402, 422-24 (1987) ("[I]f a defendant requests such an evaluation or presents psychiatric evidence, then, at the very least, the prosecution may rebut this presentation with evidence from the reports of the examination that the defendant requested. The defendant would have no Fifth Amendment privilege against the introduction of this psychiatric testimony by the prosecution."); *see United States v. Curtis*, 328 F.3d 141, 144-45 (4th Cir. 2003) (same); *Savino v. Murray*, 82 F.3d 593, 604 (4th Cir. 1996) (same).

mental capacity *and* (2) that significantly reduced mental capacity contributed substantially to the commission of the offense. USSG § 5K2.13. There is simply no such evidence that the defendant suffered from a significantly reduced mental capacity at the time he committed the offense, nor is there any evidence that it "contributed substantially" to the commission of the offense. And, even if there were evidence of both of these, a departure to a sentence of less than life imprisonment would still be inappropriate because "the facts and circumstances of the defendant's offense indicate a need to protect the public because the offense involved actual violence [and] a serious threat of violence." *Id.*

In sum, any mental health concerns raised by the defendant do not overcome the defendant's demonstrated lack of remorse and his prior history of substantial racial animus. Accordingly, this factor also weighs heavily in favor of a life sentence.

### C. A Life Sentence Will Reflect the Seriousness of the Offense, Promote Respect for the Law, Provide Just Punishment, Afford Adequate Deterrence, and Protect the Public.

A life sentence in this case is absolutely necessary to reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, and protect the public.

The right to protest is a birthright of every American. By his crimes, the defendant sought to intimidate those protesting white supremacy and racial discrimination. By doing so, he committed both a hate crime *and* an act of domestic terrorism, which resulted in death and destruction. His conduct therefore crosses an exceedingly high threshold and joins a rare class of cases in which only a life sentence will reflect the seriousness of the offense.

A life sentence for a crime as egregious as the defendant's is also necessary to adequately promote respect for the rule of law. The defendant's crimes clearly run contrary to our nation's bedrock principles of equality, regardless of one's race, color, religion, or national origin. As one victim stated:

The consequences of Mr. James Alex Fields, Jr.'s horrendous crime should be the rest of his life in prison, and a ruling that federally condemns crimes against people based on race, gender, sexuality, and religion. Such a federal condemnation would validate protection for all Americans regardless of these categorical distinctions and be an important step in correcting past misdirection. . .

(*Victim Impact Statement of M.A.N.*, 5/28/19.)   Traditionally, promoting respect for the law is often viewed from a putative defendant's perspective.   But, that is too myopic a view for this case. Here, a life sentence will not only promote respect for the law by those in the future considering whether to break it, but it will also send a message to the victims in this case, to the Charlottesville community, and to people everywhere who suffer racial, religious, and ethnic discrimination that hate crimes shall not be tolerated.   To promote respect for the rule of law, a life sentence must be imposed.

A life sentence is also the only sentence that will provide just punishment, protect the public, and afford adequate deterrence.   The defendant was ideologically motivated and attempted the mass murder of scores of innocent people who were protesting white supremacy and racial discrimination.   His actions killed one, injured dozens more, and sent a shockwave of emotional trauma from scene of the attack, to the entire City of Charlottesville, the Commonwealth of Virginia, the United States of America, and beyond.   The defendant has demonstrated that he feels no remorse, and rather, that he still views the people in the crowd just as he did on August 12, 2017 – as his enemies.   A life sentence is the only sentence that would provide just punishment for his conduct and protect the public from him for the rest of his life.

This Court is in a unique position to send a strong deterrent message to other individuals who share the defendant's radical views and who may want to translate those views into hate crimes and acts of domestic terror.   The defendant was not the only white supremacist in Charlottesville on August 12, 2017, nor was he the only one engaged in violence.   It is not a crime to hate another individual because of his or her race, color, religion, or national origin, or to espouse those views to others.   But it is a crime to commit acts of murder and violence in service

to that hateful ideology. A sentence of life imprisonment will demonstrate to those who share the defendant's same hate-filled ideologies and who may be considering violent action that such crimes will be met with severe punishment.

### D. A Life Sentence Avoids A Sentencing Disparity.

This is a unique case. The government has been unable to identify any prior cases involving similar motivation, conduct, and consequences. The sheer quantity of victims in this case is staggering, and the government could have charged more.

The case of *United States v. Saipov* is probably the most similar in terms of motivation and conduct, where an ideologically-motivated defendant drove his truck into a crowded area, killing eight and injuring at least 15 more. That case, however, has not yet resolved and the United States is seeking the death penalty. In *United States v. Purinton*, (D. Kansas 2018), the defendant, motivated by anti-Muslim bias, opened fire on two Indian men in a crowded restaurant, killing one and injuring the other and a bystander who tried to stop the attack. That defendant was sentenced to a term of life imprisonment after accepting a plea.

More importantly, both statutory and guideline provisions should assure the Court that a life sentence is hardly a disparity. The federal murder statute, 18 U.S.C. § 1111, provides for a mandatory minimum life sentence for first degree murder. Although the statute does not apply to this conduct due to the absence of a jurisdictional nexus, it nevertheless makes clear that life sentences are not only expected for first degree murder, they are mandatory. Second, as noted above, the First Degree Murder guideline of § 2A1.1, which applies here, provides that: "In the case of [a] premeditated killing, life imprisonment is the appropriate sentence if a sentence of death is not imposed." Both of these provisions make clear that a life sentence would not create a sentencing disparity. In fact, it is the only appropriate sentence.

## VII. CONCLUSION

Life imprisonment is the only appropriate sentence for the defendant. For the reasons given above, a term of life is necessary, sufficient, and not greater than necessary to properly account for each of the statutory factors. Of particular concern to the government are the seriousness of the offense, which continues to have a deep and lasting impact on the victims and the community of Charlottesville; the need to promote respect for the law by showing hate crime victims and other people who are subjected to discrimination that the federal law will protect them; the need to provide just punishment for violence that is both a hate crime and an act of domestic terrorism; and the need to send a strong deterrent message that such violence against any person – of any race, color, religion or national origin – will not be tolerated and will be punished with the full force of the law.

WHEREFORE, the United States submits this memorandum in aid of sentencing and in support of its request for the imposition of a sentence of life imprisonment.

Respectfully submitted,

　　/s/Thomas Cullen　　　　　　　　　
THOMAS T. CULLEN
UNITED STATES ATTORNEY
WESTERN DISTRICT OF VIRGINIA

　　/s/Christopher R. Kavanaugh　　　　　
Christopher Kavanaugh, Va. Bar. 73093
Assistant United States Attorney
United States Attorney's Office
255 W. Main Street
Charlottesville, VA 22902
434-293-4283
christopher.kavanaugh@usdoj.gov

　　/s/Risa Berkower　　　　　　　　　
Trial Attorney
U.S. Department of Justice,
Civil Rights Division
risa.berkower@usdoj.gov

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 21, 2019, I electronically filed the foregoing motion with the

Clerk of the Court using CM/ECF system, which will send notification of such filing to all

counsel of record.

                                                 __/s/Christopher R. Kavanaugh_____
                                                 Christopher Kavanaugh, Va. Bar. 73093
                                                 Assistant United States Attorney
                                                 United States Attorney's Office
                                                 255 W. Main Street
                                                 Charlottesville, VA 22902
                                                 434-293-4283
                                                 christopher.kavanaugh@usdoj.gov